UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
------------------------------------------------------------X
DONNA M. KABBAS-LINCHES,

                Plaintiff,          **MEMORANDUM and ORDER**

    — against —                           05-CV-4853 (SLT)

COMMISSIONER OF SOCIAL SECURITY,

                Defendant.
------------------------------------------------------------X
**TOWNES, United States District Judge:**

       Plaintiff, Donna M. Kabbas-Linches ("Plaintiff"), brings this action pursuant to Section 205(g) and Section 1631(c)(3) of the Social Security Act (42 U.S.C. §§ 405(g) and 1383(c)(3)), seeking review of U.S. Administrative Law Judge ("ALJ") Michael I. Gewirtz's August 3, 2005, determination that Plaintiff was not disabled and, therefore, not entitled to Disability Insurance Benefits. Defendant Commissioner of Social Security ("Defendant" or "Commissioner") and Plaintiff now cross-move for judgment on the pleadings pursuant to Rule 12(c) of the Federal Rules of Civil Procedure. For the reasons stated below, Defendant's motion, which urges this Court to find that there was substantial evidence to support the ALJ's determination, is denied. Plaintiff's motion, which principally alleges that the ALJ failed to adequately develop the record and that the ALJ's ruling was not supported by substantial evidence, is granted and this matter is remanded to the Commissioner for further proceedings consistent with this Memorandum and Order.

*BACKGROUND*

       Plaintiff was born Donna Marie Kabbas on March 29, 1960, in Brooklyn, New York (35, 40, 124).[1] Plaintiff obtained a General Equivalency Diploma in 1977 (58, 77, 124), and began

---

[1] Numbers in parentheses indicate pages in the Administrative Record.

working as an insurance clerk in 1978 (53). Plaintiff continued working as an insurance clerk until 1989, when she became a licensed insurance broker (53). That job, which Plaintiff held for the next seven years, was sedentary and did not require heavy lifting. According to Plaintiff, she sat 100 per cent of the time, and never lifted anything heavier than 25 pounds (53).

On November 6, 1994, Plaintiff married Craig Linches and changed her surname to Kabbas-Linches (35). Less than two years later, Plaintiff gave birth to a son, Justin (35-36, 129). Plaintiff stopped working before Justin was born (52, 73), but returned to work part-time sometime in 1997. According to information Plaintiff supplied as part of her disability claim, Plaintiff did a little computer-related work for a construction company in 1997, earning less than $3,000 (53). In 1998, Plaintiff took a part-time position as an administrative assistant at Premier, a textile company, working five hours a day, three days a week, and earning approximately $16,000 (53, 130).

Plaintiff worked at Premier for about a year before the company went out of business (130). Plaintiff was not employed again until 2001, when she had two part-time, clerical jobs in which she earned less than $800 per month (125-26). The first of these lasted about six months, and the second lasted about three months (125).

Although Plaintiff had a history of hypothyroidism dating from at least the mid-1980's (138), Plaintiff did not begin to feel ill until sometime in 2000 (131). At that time, Plaintiff was a patient of Gerard Casale, M.D., an internist practicing on Bay Ridge Parkway in Brooklyn (45, 54). However, since the administrative record does not contain any of Dr. Casale's charts or office records, this Court cannot determine the precise onset of, or nature of, Plaintiff's 2000 illness.

Sometime in 2001, Plaintiff was diagnosed with "gastritis" (136). This Court will take judicial notice that gastritis – an inflammation or irritation of the lining of the stomach – is not a single disease, but a condition having many potential causes. *See* http://www.emedicinehealth.com/gastritis/article_em.htm. However, since the administrative record is devoid of any documentation relating to the diagnosis, cause or treatment of Plaintiff's gastritis (aside from the fact that Plaintiff recalls taking Prevacid (137)), it is impossible to assess the severity of Plaintiff's condition. Accordingly, one cannot guage from the record the effect which this condition may have had on Plaintiff's ability to perform clerical work.

In April 2002, Plaintiff was hospitalized for one week after passing bloody stools and becoming dehydrated (60). In light of Plaintiff's history of chronic gastritis, doctors initially suspected stomach ulcers and performed a biopsy of the gastric antrum on April 23, 2002 (83). However, that biopsy proved negative for Helicobactor pylori (or H. pylori) (83) – a bacterium which is the most common cause of stomach ulcers. *See* http://www.mayoclinic.com/health/h-pylori/DS00958. About one week later, on April 30, 2002, a gastroenterologist – Dr. Antonio Palagiano – performed a biopsy of Plaintiff's sigmoid colon, which resulted in a diagnosis of "mild non-specific colitis" (88, 91). Aside from pathology reports relating to these biopsies (88-89, 91), and a "Colonscopy Procedure Report" relating to the second procedure (92), there are no documents in the administrative record relating to Plaintiff's April 2002 hospitalization.

Following her release from the hospital, Plaintiff visited Dr. Palagiano on a regular basis, perhaps as frequently as once every two weeks (94). He apparently treated her with steroids and a host of other medications (118), but found that Plaintiff presented a "difficult case" (95). In April 2003, Plaintiff was hospitalized for another week for problems relating to her colitis.

3

While Plaintiff recalls that she received "constant IVs," antibiotics and two colonoscopies while in the hospital (60), the exact nature of the problems that resulted in Plaintiff's second hospitalization are unclear. The administrative record does not contain Dr. Palagiano's medical charts or office records, or any hospital records other than a pathology report relating to an April 4, 2003, colonoscopy (90). That report, issued following examination of a specimen removed from the left side of Plaintiff's colon, confirmed that Plaintiff had "active colitis with cryptitis and depletion of goblet cells" (90).

In the Fall of 2003, Dr. Palagiano referred Plaintiff to a specialist, Dr. Herbert Dyrszka, in an effort to control Plaintiff's colitis (55). Although Plaintiff's disability claim states that she was scheduled to see Dr. Dyrszka on October 16, 2003 (55), there are no medical documents relating to this visit in the administrative record.

On October 15, 2003, Plaintiff applied for disability insurance benefits. In the course of evaluating her claim, a Disability Analyst from the New York State Office of Temporary and Disability Assistance ("OTDA") sent questionnaires to both Dr. Casale and Dr. Palagiano. Both doctors responded and opined that Plaintiff could sit or stand without limitation, and could occasionally lift and carry objects (97, 103). Dr. Casale noted that Plaintiff's physical activity could be "limited" when she had active ulcerative colitis and diarrhea and that she had suffered "severe blood[y] diarrhea ... in the recent past" (103), but claimed that she had "responded well" to treatment with "[A]sacol and steroids" (101).[2] However, Dr. Casale also stated that he had not seen Plaintiff in more than three months (100), and that her digestive problems were being

---

[2] Asacol is a brand of Mesalamine, a prescription drug often used to treated ulcerative colitis. *See* http://www.medicinenet.com/mesalamine-tablet/article.htm.

4

treated by "GI" – presumably, Dr. Palagiano, her gastroenterologist – who had prescribed the Asacol and steroids (100-01).

Dr. Palagiano's questionnaire did not echo Dr. Casale's rosy assessment. Dr. Palagiano characterized Plaintiff's ulcerative colitis as "very active" (95) (emphasis in original), and her case as "difficult" (95). The doctor noted that Plaintiff had been "steroid dependent" for more than two years and implied that the medications he prescribed had not been effective, stating that Plaintiff would resume work when her colitis was "brought under full control" (98). Dr. Palagiano opined that Plaintiff remained "unable to work at present" due to fatigue and pain (95). The OTDA did not arrange to have Plaintiff examined by a medical expert. Rather, on January 2, 2004, the Disability Analyst sent the treating physicians' questionnaires to a Dr. P. Seitzman, asking the doctor's advice regarding Plaintiff's residual functioning capacity (106). In evaluating the questionnaires, Dr. Seitzman noted that Plaintiff was "said to be a 'difficult case' requiring regular steroids" (106). However, Dr. Seitzman ignored any mention of fatigue or pain in the questionnaires, focusing instead on the fact that Plaintiff could sit and stand without limitation and could occasionally lift items weighing up to 10 pounds (106). Dr. Seitzman also noted that there was "[n]o evidence of weight loss, blood transfusion [or] surgery" (106), although it unclear whether he had any medical documents other than the two questionnaires.[3]

On January 30, 2004, the OTDA denied Plaintiff's claim, finding that her condition was "not severe enough to keep [her] from working" (13). According to the OTDA's "Explanation of Determination," the only documents considered in reaching this determination were the

---

[3]According to Plaintiff, she did in fact have surgery later in 2004. At a hearing before the Administrative Judge on July 14, 2005, Plaintiff testified that the surgery was necessary to repair fissures which had developed in her intestines as a result of the colitis (135). No documentation concerning this surgical procedure appears in the administrative record.

5

questionnaires from Drs. Casale and Palagiano (13). The OTDA stated that it had "not obtain[ed] any other reports because no others were available" (13).

Although the OTDA claimed to have based its determination on the two doctors' questionnaires, its findings bore little resemblance to the information contained in those documents. The OTDA made no mention of Plaintiff's fatigue and pain, but characterized the medical evidence as showing that Plaintiff "had abdominal discomfort and diarrhea" (13). Although Dr. Palagiano's questionnaire implied that Plaintiff's colitis was not "under full control," the OTDA further determined that Plaintiff's "condition [had] stabilized" following treatment (13). The OTDA concluded that Plaintiff could still perform "sedentary work" and, therefore, was not disabled (13).

Plaintiff appealed the OTDA's decision and, on April 1, 2004, retained counsel to represent her on the appeal (20). It is unclear whether Plaintiff's counsel submitted any additional evidence, other than a letter from Dr. Palagiano dated June 14, 2005. In that letter, Dr. Palagiano stated that Plaintiff's colitis had been "very difficult to manage" and had required "very close medical follow up/steroids/antibiotics/6 MP/Asacol/Probiotics" (119).[4] He opined that, "[i]n spite of all treatment[,] the colitis is still active and interferes greatly with [Plaintiff's] personal life" (119). The doctor also stated that he "believe[d] firmly" that Plaintiff was "totally unable to perform any work duties due to her condition" (119).

On August 3, 2005, Administrative Law Judge Michael I. Gewirtz upheld the OTDA's decision, determining that Plaintiff was capable of resuming her past relevant work (11). In reaching this determination, the ALJ found, *inter alia*, that Plaintiff's "allegations of disabling

---

[4] 6-MP, a brand of mercaptopurine, is a chemotherapy drug, originally developed to fight leukemia, but also used to treated ulcerative colitis. *See* http://www.chemocare.com/bio/mp.asp; http://gicare.com/MEDICATIONS/Medications.aspx?CID=16&ID=176.

6

impairments" were not "supported by the record" (11). However, ALJ Gewirtz expressly stated that the only medical evidence on which he relied were the questionnaires prepared by Drs. Casale and Palagiano, Dr. Seitzman's analysis of those questionnaires, and Dr. Palagiano's letter dated June 14, 2005 (10). The ALJ did not have medical records from Drs. Casale or Palagiano; any records concerning Plaintiff's two hospitalizations at Victory Memorial Hospital, other than documents relating to three biopsies; any evidence whatsoever from Dr. Dyrszka, the gastrointestinal specialist who Plaintiff allegedly consulted in October 2003; or any records relating to Plaintiff's 2004 surgery. The ALJ did not allege that he himself made any effort to obtain these missing records. Rather, he cited to a document (116-17) suggesting that the Disability Analyst may have requested some of the records as proof that the medical record had been "affirmatively developed" (9).

Although Dr. Palagiano's questionnaire and Dr. Palagiano's 2005 letter both stated that Plaintiff was unable to work (95, 118), ALJ Gewirtz opined that Dr. Palagiano's June 2005 letter was "decidedly more restrictive than his earlier assessment" in that it stated "that the claimant was unable to work" (10). Believing that Dr. Palagiano's questionnaire and letter conflicted, ALJ Gewirtz resolved the perceived conflict by entirely discounting Dr. Palagiano's assessment that Plaintiff could not work. The ALJ ruled that this assessment reflected Plaintiff's condition only as of June 2005, "a year and a half after the claimant's disability insurance expired" (10).

In determining that Plaintiff was not disabled, the ALJ principally relied on Dr. Casale's assessment that the medications Plaintiff was taking were producing "good results" (10). ALJ Gewirtz interpreted Dr. Casale's questionnaire as stating "that the claimant had been treated with

7

steroids and Asocol [*sic*] and Synthroid, the latter of which had produced good results" (10).[5]

The ALJ characterized Dr. Casale as Plaintiff's "treating physician" (10), but made no mention of the fact that Dr. Casale was not a gastroenterologist and had not examined Plaintiff in more than three months at the time he completed the questionnaire.

Plaintiff appealed ALJ Gewirtz's decision to the Social Security Administration's Office of Hearing and Appeals, asserting that the ALJ's decision was not supported by substantial evidence (6). However, in a notice dated September 3, 2005, the Appeals Council informed Plaintiff that it found no reason to review the ALJ's decision, and that ALJ Gewirtz's decision was, therefore, the final decision of the Commissioner of Social Security in her case (3). On October 17, 2005, Plaintiff commenced this action, seeking to reverse the Commissioner's final decision or, in the alternative, to remand the matter for further proceedings.

The parties to this action have now cross-moved for judgment on the pleadings pursuant to Rule 12(c) of the Federal Rules of Civil Procedure. Defendant argues only that ALJ Gewirtz's decision was supported by substantial evidence. *See* Memorandum of Law in Support of the Commissioner's Motion for Judgment on the Pleadings ("Defendant's Memo") at 5-14. Plaintiff's Memorandum of Law in Opposition to Defendant's Motion for Judgment on the Pleadings and in Support of Plaintiff's Cross-Motion for Judgment on the Pleadings ("Plaintiff's Memo") refutes Defendant's argument, and further contends that the ALJ failed to adequately develop the administrative record and to properly consider the opinion of Dr. Palagiano.

---

[5]In fact, Dr. Casale stated only that the steroids and Asacol prescribed by Plaintiff's gastroenterologist were producing "good results" (101). Dr. Casale made no such claim about Synthroid which, in any event, is a drug used to treat hypothyroidism. *See* http://www.drugs.com/synthroid.html.

8

Although this Court's order dated April 28, 2006, afforded Defendant two weeks following service of Plaintiff's Memo in which to serve a reply, Defendant elected not to do so. Accordingly, Defendant has not responded to Plaintiff's assertions that the ALJ failed to develop the record or to give proper weight to Dr. Palagiano's opinion that Plaintiff was unable to work.

## DISCUSSION

A final determination of the Commissioner of Social Security with respect to whether an applicant is eligible for disability payments is "subject to judicial review as provided in [42 U.S.C.] section 405(g) ... to the same extent as the Commissioner's final determinations under section 405." 42 U.S.C. § 1383(c)(3). Under 42 U.S.C. § 405(g), district courts "review the Commissioner's decision to determine whether it was 'supported by substantial evidence in the record as a whole or [was] based on an erroneous legal standard.'" *Ligon v. Astrue*, No. 08-CV-1551 (JG)(MDG), 2008 WL 5378374, at *8 (E.D.N.Y. Dec. 23, 2008) (quoting *Schaal v. Apfel*, 134 F.3d 496, 501 (2d Cir. 1998)).

"Substantial evidence" means "more than a mere scintilla." *Richardson v. Perales*, 402 U.S. 389, 401 (1971) (quoting *Consolidation Edison Co. v. NLRB*, 305 U.S. 197, 229 (1938)). "It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Id.*; *Green-Younger v. Barnhart*, 335 F.3d 99, 106 (2d Cir. 2003) (internal quotation marks and citations omitted). In determining whether there is "substantial evidence" to support the Commissioner's determination, a district court "carefully considers the whole record, examining evidence from both sides because an analysis of the substantialilty of the evidence must also include that which detracts from its weight." *Tejada v. Apfel*, 167 F.3d 770, 774 (2d Cir. 1999) (internal quotations and citations omitted).

9

In light of this obligation to consider the "whole record," a court cannot decide whether the Commissioner's determination is based on substantial evidence without "first satisfy[ing itself] ... that the claimant has had 'a full hearing under the ... regulations and in accordance with the beneficent purposes of the [Social Security] Act." *Echevarria v. Sec'y of Health & Human Servs.*, 685 F.2d 751, 755 (2d Cir. 1982) (quoting *Gold v. Sec'y of HEW*, 463 F.2d 38, 43 (2d Cir. 1972)). As the *Echevarria* Court explained:

> The need for this inquiry arises from the essentially non-adversarial nature of a benefits proceeding: the Secretary [now, Commissioner of Social Security] is not represented, and the ALJ, unlike a judge in a trial, must himself affirmatively develop the record.

*Id.* (citing *Schauer v. Schweiker*, 675 F.2d 55, 57 (2d Cir. 1982), and *Gold*, 463 F.2d at 43). Indeed, the Second Circuit has repeatedly held that an ALJ "has an obligation to develop the record ... regardless of whether the claimant is represented by counsel." *Shaw v. Chater*, 221 F.3d 126, 131 (2d Cir. 2000); *see*, *e.g.*, *Tejada*, 167 F.3d at 774; *Pratts v. Chater*, 94 F.3d 34, 37 (2d Cir. 1996). Where much of a claimant's medical history is missing, owing to the ALJ's failure to fulfill this obligation, the record "offers ... no basis to find the substantial evidence necessary to uphold the ALJ's decision" and a court "cannot say the ALJ's decision is supported by substantial evidence." *Pratts*, 94 F.3d at 38.

In this case, as in *Pratts*, much of the plaintiff's medical history is missing from the record. Although Plaintiff had three treating physicians during the periods relevant to this action, the ALJ himself made no effort to obtain the office records of any of these doctors. The ALJ also made no attempt to obtain Victory Memorial Hospital's records relating to Plaintiff's April 2002 and April 2003 hospitalizations, or records relating to Plaintiff's 2004 surgery. Indeed, the only medical evidence in the record (aside from records relating to three biopsies)

consists of incomplete, barely legible questionnaires from two of the three treating physicians – Drs. Casale and Palagiano – and a short letter dated June 14, 2005, from Dr. Palagiano. The record contains no evidence whatsoever – not even a questionnaire – from the third treating phsyician: Dr. Dyrszka, a gastroenterology specialist who Plaintiff may have consulted in October 2003.

This sparse medical evidence is plainly insufficient to support the ALJ's determination that Plaintiff was able to resume her past relevant work. Indeed, what little medical evidence existed establishes that Plaintiff's gastroenterologist firmly believed that Plaintiff was unable to work. However, the ALJ was apparently unable to read that portion of Dr. Palagiano's questionnaire in which he wrote that Plaintiff was "unable to work at present" due to fatigue and pain (95). Instead, the ALJ mistakenly thought that Dr. Palagiano's June 14, 2005, letter, in which the doctor opined that Plaintiff was "totally unable to perform and work duties due to her condition" (119), was "decidedly more restrictive than his earlier assessment," and refused to credit it (10).

Because the ALJ misunderstood Dr. Palagiano's questionnaire, he saw no conflict between Dr. Palagiano's opinion and that of Plaintiff's internist, Dr. Casale. In fact, these two treating physicians had markedly different views as to whether Plaintiff was responding well to drug therapy. Dr. Casale, who had not seen Plaintiff in more than three months at the time he completed his questionnaire, believed that Plaintiff's gastroenterologist had gotten "good results" using steroids and Asacol (101). However, Dr. Palagiano, the gastroenterologist who prescribed these drugs, implied in his questionnaire that Plaintiff's colitis was not "under full control" in December 2003 (98), even though Plaintiff had been "steroid dependent" for over

11

two years (95). Rather, Dr. Palagiano stated that Plaintiff's colitis was "still active and interfer[ing] greatly with her daily life and well-being" in June 2005, "[i]n spite of ... treatment" with steroids, antibiotics, 6-MP, Asacol and Probiotics (119).

"Where there is conflicting evidence on the issue of disability, 'it is for the [Social Security Administration], and not this court, to weigh the conflicting evidence in the record,' particularly when the court 'cannot say with certainty what weight should be assigned ... to the opinion of plaintiff's treating physician.'" *Heath v. Astrue*, No. CV-07-1238 (FB), 2008 WL 1850649, at *2 (E.D.N.Y. Apr. 24, 2008) (quoting *Schaal*, 134 F.3d at 104). In this case, given the nearly complete absence of medical records, neither this Court nor anyone else can currently determine which of the two doctors' conflicting views to credit. Accordingly, this case is remanded to the Commissioner for further development of the record and for a determination as to whether Plaintiff was or was not able to perform her relevant work during the relevant time period.

## CONCLUSION

For the reasons set forth above, Defendant's motion for judgment on the pleadings is denied. Plaintiff's motion for judgment on the pleadings is granted to the extent of remanding this case to the Commissioner for further proceedings consistent with this Memorandum and Order.

SO ORDERED.

Dated: Brooklyn, New York
January 13, 2009

*Sandra L. Townes*
SANDRA L. TOWNES
United States District Judge